# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

AMY J. HUNTER,

    Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,[1]

    Defendant.

No. C06-3056-MWB

**REPORT AND RECOMMENDATION**

---

## I.  INTRODUCTION

The plaintiff Amy J. Hunter ("Hunter") seeks judicial review of a decision by an administrative law judge ("ALJ") denying her application for Title XVI supplemental security income benefits.  Hunter claims the ALJ erred in assessing her residual functional capacity, assigning weight to various types of medical evidence in the record, and submitting an inaccurate hypothetical question to the vocational expert.  (*See* Doc. Nos. 9 & 11)

## II.  PROCEDURAL AND FACTUAL BACKGROUND

### A.  Procedural Background

On May 9, 2003, Hunter protectively filed an application for SSI benefits.  She originally alleged disability since her birth on July 25, 1978.  (*See* R. 58)  At the ALJ hearing, she amended her alleged onset date to October 23, 2003.  (R. 408-09)  Hunter claims she is disabled due to Attention Deficit Hyperactivity Disorder (ADHD),

---

[1]This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration ("SSA").  On February 12, 2007, Michael J. Astrue became Commissioner of Social Security.  He therefore is substituted as the defendant in this action.  *See* Fed. R. Civ. P. 25(d)(1).

Oppositional Defiant Disorder, bipolar disorder, general anxiety disorder, "substances abuse issues," and asthma. (R. 117) She claims these conditions make it difficult for her to focus and concentrate, and for her to be around people in social or work-related settings. (R. 117-18)

Hunter's application was denied initially and on reconsideration. On August 17, 2005, a hearing on the application was held in West Des Moines, Iowa, before ALJ George Gaffaney. Hunter was represented at the hearing by attorney Robert L. Johnson. Hunter testified at the hearing, and Vocational Expert ("VE") Elizabeth Albrecht also testified. On February 8, 2006, the ALJ ruled Hunter was not disabled and not entitled to benefits. (R. 18-29) Hunter appealed the ALJ's ruling, and on July 6, 2006, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. 7-10)

Hunter filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Hunter's claim. Hunter filed a brief supporting her claim on December 15, 2006. (Doc. No. 9) The Commissioner filed a responsive brief on February 9, 2007. (Doc. No. 10) Hunter filed a reply brief on February 13, 2007. (Doc. No. 11) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Hunter's claim for benefits.

## B.  Factual Background

### 1.  *Introductory facts and Hunter's hearing testimony*

Hunter is 5'7" tall, and at the time of the hearing weighed 140 pounds. She lives with her three children, ages one, four, and five. (R. 403) Her income consists of state

2

assistance, food stamps, and rental assistance. (R. 496) She finished the tenth grade and part of the eleventh grade in school where, according to Hunter, she was always in special education courses. (R. 408)

Hunter was raped on October 25, 2003. She stated she also was raped when she was six years old, but the 2003 rape exacerbated her existing impairments. Prior to the 2003 rape, Hunter had a serious substance abuse problem. She claims to "have significantly . . . gotten a handle on that" since the rape, although she has had a few relapses. (R. 408-10) She went through a drug treatment program, and continues to attend twelve-step meetings. She stated that since her drug treatment, she has had two relapses with methamphetamine, one in March 2004, and one in June 2005. She admitted she has smoked marijuana a few times, including once within the two weeks prior to the ALJ hearing. She stated she had not used any alcohol in three months. (R. 399-400, 410) Hunted stated she no longer associates with people who use drugs. She goes to some AA functions, but otherwise, she stays at home with her children. (R. 400) According to Hunter, she has had numerous clean drug tests, which apparently are required for her to continue receiving state benefits. (*See* R. 410)

Hunter worked part time from January to May 1998, as a prep cook. She worked part time from June to August 2001, as a housekeeper at a motel. (R. 126, 412) Her last job was from March to May 2002, when she worked part time as a telemarketer. (*Id.*; R. 396) She quit working when she was hospitalized for mental health problems. (R. 396) She stated she is unable to work due to anxiety and depression, which cause her difficulty in dealing with supervisors and handling work situations. (R 396-97) She stated, "I can't go outside in public a lot because I can't breathe and I can't be around a lot of people 'cause I get scared." (R. 404) She cries easily and does not consider herself to be a "normal person." (*Id.*) When asked if anything makes her symptoms worse, she responded that stress and "[e]very day life sometimes just makes it worse." (*Id.*)

3

Hunter is assisted almost daily by a social worker, Judy Winkelman, who drives Hunter to her doctors' appointments, her children's activities and school, and shopping trips. Hunter stated she has never had a driver's license and she does not drive. She does not leave her house by herself. Judy has helped care for Hunter's children when Hunter was abusing drugs. According to Hunter, Judy helped her realize she needed to get off drugs and helped her get into drug treatment. Judy does some of Hunter's house cleaning, helps her learn to discipline her children, and helps her keep a schedule regarding child care and house cleaning activities. (R. 397-98)

Hunter's father also helps her with day-to-day activities. She stated he comes over every night after work and sits with her until about 8:00 p.m. He helps bathe her children and changes their clothes. She stated someone helps her with child care at least twice a week, taking her children out of the home for awhile. Hunter stated that without this assistance, she would be unable to keep her children. (R. 398-99)

Hunter appeared at the hearing with her right hand in a cast. She stated she broke her hand about a week before the hearing. (R. 394-95) She explained that she has a "very bad anger management problem, and [she] hit a metal door and shattered [her] hand." (R. 401) Hunter denied that she was on alcohol or any other drug at the time she broke her hand. (*Id.*) She further stated she fractured her right wrist about five years earlier, but the fracture was never treated. According to Hunter, an orthopedist told her that when her broken hand is healed, they "will have to go in and fix [her] right wrist[.]" (R. 402)

Hunter stated that due to her depression, she sometimes does not get off the couch, clean her house, or do her dishes. Judy attempts to motivate her by having her do a cleaning task for fifteen minutes at a time. Hunter stated she can do most of her own housework, but she gets overwhelmed easily and then she needs help to get the housework done. (R. 403) Hunter had planned to have Judy present to testify at the hearing; however, Hunter's attorney learned Judy had lost her job recently and he had had difficulty

4

contacting her. He submitted a letter from Judy subsequent to the hearing. (R. 401, 404; *see* R. 370-71, letter from Judy Winkelman dated August 22, 2005) Despite changing jobs, Judy continues to provide assistance to Hunter through her new employer. (R. 402-03)

At the time of the hearing, Hunter stated her current medications were Ambien to help her sleep, Xanax for anxiety, and Topamax for mood swings. She stated that despite her medications, her anxiety was "out of control," and she planned to ask her psychiatrist to change her medications. (R. 402) She indicated her medications relieve her symptoms somewhat, but not completely. (R. 403) She usually takes her medications as directed, although at times in the past, she has not done so. (R. 406) She denied allegations in the record that she had exhibited drug-seeking behavior since her amended alleged onset date. (R. 407)

Hunter stated she usually drinks three Mountain Dews per day. She indicated her psychiatrist has advised her to eliminate caffeine, so she has begun drinking water as well. She smokes between half a pack and one pack of cigarettes daily, although, according to Hunter, her doctor has advised her to stop smoking due to her asthma. (R. 405) She stated her asthma is under control on Advair, which she takes daily, and an Albuterol inhaler and nebulizer treatments, which she uses as needed. (R. 407)

Hunter stated she is partially deaf in her left ear. (R. 405)


2. *Hunter's medical history*

From January 10, 2002, to February 13, 2003, Hunter was treated for mental health issues at St. Anthony Mental Health Services. Her primary diagnoses were Bipolar Disorder II and ADHD. Her medications for these conditions included Thorazine, an anti-psychotic medication; Topamax, an anti-convulsant medication sometimes used to treat

5

migraines; Klonopin, used to treat panic attacks; and Metadate CD, used to treat ADHD.[2] (R. 170; *see generally* R. 167-87)

Hunter entered a substance abuse treatment program on July 30, 2002. She attended only four days of treatment sessions, during which she was disruptive, noncompliant, and considered to be at risk for continued substance abuse. She was discharged from the program on August 2, 2002. (R. 138-43) During the same period of time, from July 11, 2002, to September 19, 2002, Hunter was involved in a court-ordered outpatient substance abuse treatment program at New View Substance Abuse Treatment & Prevention Center ("New View"). She had poor attendance, continued using substances, and was discharged from the program on September 19, 2002. (R. 194)

On September 20, 2002, she was admitted for inpatient substance abuse treatment at Covenant Medical Center in Waterloo, Iowa. She spent thirteen days in the program, and made some progress. Her condition was stabilized, she got "back on the right track," and she was discharged on October 3, 2002, with plans to follow up with her local Narcotics Anonymous group and mental health support from her local hospital. (R. 145; *see generally* R. 144-59)

On March 28, 2003, Hunter was admitted to the hospital after threatening suicide. She stated she had stopped taking her antidepressant and anti-anxiety medications some two months earlier, and her condition was deteriorating. Notes indicate she had "a significant history for non-compliance with her medication and treatment program." (R. 160) Her admitting diagnosis was "bipolar disorder most recent episode depressed." (*Id.*) Hunter reportedly was uncooperative, noncompliant, and belligerent during her stay. She left against medical advice on March 31, 2003. (*Id.*; *see generally* R. 160-66)

On April 11, 2003, Hunter was evaluated for re-entry into a program at New View, where it was recommended she participate in a weekly outpatient continuing care group

---

[2]Drug information taken from www.rxlist.com (05-29-2007).

and individual counseling sessions. Hunter attended group or individual sessions on May 7, 16, 20, 21, and 23, and June 4, 2003. On June 10, 2003, she was noted to be "making progress toward her treatment goals." (R. 189; *see* R. 190-91)

Hunter's social worker, Judy Winkelman, referred her for individual counseling, and on June 27, 2003, Hunter underwent an intake assessment by Jim Coats, a licensed social worker. (R. 200-02) He assessed Hunter with "Bipolar disorder, ADHD, Oppositional defiant disorder, [and] Anxiety disorder." (R. 201) He noted he had been seeing Hunter in his private practice since April 2002, and stated Hunter "suffers from chronic mental illness and has a long-term problem with drugs and alcohol." (R. 200) Coats planned to continue seeing Hunter weekly for individual counseling sessions. (R. 202)

On July 14, 2003, Hunter underwent a psychological evaluation by John F. Wallace, Ph.D., at the request of Disability Determination Services. (R. 203-07) Dr. Wallace's testing indicated Hunter had a verbal IQ of 75, performance IQ of 76, and full scale IQ of 74, all of which were noted to be "within the Borderline range of scores." (R. 204) Based on his testing, and on Hunter's description of her symptoms over time, Dr. Wallace found Hunter met the "diagnostic criteria for Bipolar I Disorder, Most Recent Episode Depressed, In Partial Remission; Panic Disorder Without Agoraphobia; and Borderline Intellectual Functioning." (R. 206) He found Hunter's described symptoms did not clearly suggest diagnoses of either Generalized Anxiety Disorder or ADHD. (*Id.*) He noted that Hunter's borderline intellectual capabilities and her problems with attention and concentration likely would cause significant impairment in her work-related functioning. He opined she would be "prone to decompensation in response to work-related stress," and she likely would have "difficulty in reacting appropriately to work place changes and in interacting appropriately with others." (R. 206) He further noted Hunter's borderline intellectual capabilities likely would render her "less able to cope

7

effectively with symptoms associated with her other psychiatric disorders." (*Id.*) Dr. Wallace suggested a payee would be helpful if Hunter were to receive monetary benefits. (*Id.*)

On July 22, 2003, David G. Beeman, Ph.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form (R. 208-11), and a Psychiatric Review Technique Form (R. 214-27). He found that although Hunter has severe mental impairments, they do not meet or equal listing level severity. He found Hunter would have moderate restrictions in her work-related abilities, but she "retains the ability to complete simple, routine, and repetitive work functions when motivated to do so." (R. 213; *see* R. 212-13) He found Hunter's credibility to be somewhat suspect due to inconsistencies between her self-report and her father's comments, and record evidence that Hunter repeatedly had been noncompliant with treatment recommendations. (*Id.*)

On July 22, 2003, Claude H. Koons, M.D. apparently reviewed the record to determine the severity of Hunter's asthma. He reached the conclusion that her asthma "does not significantly affect her daily activities and would be considered nonsevere." (R. 228) J.D. Wilson, M.D. concurred in this opinion when he reviewed the record on February 10, 2004. He noted Hunter had received only minimal treatment for asthma, and the record contained "no evidence of current breathing treatments or ex[a]cerbations of her asthma condition." (R. 274)

On January 21, 2004, Hunter was admitted to the hospital with an upper respiratory infection. She was treated with IV fluids, IV Rocephin, and nebulizer treatments with Xopenex. She improved steadily and was discharged on January 24, 2004. (R. 276, 278-79)

On March 22, 2004, Hunter was seen by James R. McQueen, D.O. at St. Anthony Regional Hospital with complaints of "[o]ngoing nausea and vomiting and dehydration complicating second trimester of pregnancy." (R. 290) In his assessment of Hunter's

8

condition, the doctor noted Hunter "was recently committed to a drug treatment program in Cedar Rapids," where she began experiencing nausea and vomiting after about a week. Although the treatment center staff suggested Hunter be seen at a Cedar Rapids hospital, Hunter "elected to leave the program and come home for evaluation" by the doctor who had been following her during her pregnancy. (R. 290) He noted Hunter was "quite noncompliant" in her continued smoking and caffeine abuse, and he was concerned that she had continued using either methamphetamine or marijuana during her pregnancy, despite a clean drug screen in the Cedar Rapids program. (*Id.*) Hunter was admitted to the hospital for IV hydration and observation. The record does not indicate when she was discharged. (*See* R. 290-91)

Hunter delivered her baby on July 22, 2004. She did well postpartum and was discharged on July 23, 2004. (R. 287) Hunter continued to experience abdominal pain after she had her baby. She was seen with complaints of abdominal and pelvic discomfort on August 24 and September 12, 2004. (R. 284-86) At the latter visit, when the doctor advised Hunted to follow up with her family doctor the next day, Hunter became angry, "kicked the table and got quite upset prior to discharge." (R. 284) On September 22, 2004, Hunter underwent a laparoscopic procedure "to rule out abscess or chronic appendicitis." (R. 282) Although her "appendix appeared normal," it was removed during the procedure. (*Id.*)

On September 4, 2004, Coats prepared an annual review of Hunter's progress during her individual counseling. (R. 312-14) He noted Hunter had "not been able to manage sobriety during this last year, but drug and alcohol usage [have] been drastically curtailed." (R. 313) Hunter reportedly still drank occasionally and "smoked marijuana very occasionally," but felt remorseful when she did so and reportedly continued to participate in the Alcoholics Anonymous program. (*Id.*) Coats planned to continue Hunter's counseling sessions on a weekly or bi-weekly basis. (R. 314)

9

On October 3, 2004, Hunter was seen for a refill of her pain medications. She was given ten pills of Percocet and ten pills of Vicoprofen to last until her post-surgical follow-up exam. (R. 281)

Hunter was seen in the hospital on February 27, 2005, with complaints of right wrist pain. She stated she had injured her wrist "when she was trying to lift her kids and [fell] against the crib." (R. 280) X-rays were normal. She was placed in a splint and was directed to follow up with her family doctor. (*Id.*)

On April 13, 2005, Hunter was seen by psychiatrist Theodore R. Liautaud, D.O. for a mental health diagnostic evaluation. (R. 307-11) Hunter reported continuing mental health symptoms despite being back on Topamax. The doctor noted Hunter "complicates her recovery by excessive caffeine abuse and dependence." (R. 307) Dr. Liautaud diagnosed Hunter with bipolar disorder, major depressive disorder, generalized anxiety disorder, substance abuse/dependence, mixed substance abuse and dependence by history, caffeine and nicotine dependence, and a variety of familial and social relational problems. (R. 310) He prescribed Xanax and Topamax, and directed her to continue therapy with Coats. (*Id.*) He noted Hunter had given "a commitment regarding self-harm and not to use." (R. 311)

On May 24, 2005, Hunter was admitted to the hospital's mental health unit after she presented to the emergency room with complaints of suicidal ideation. She reported that about two to three weeks earlier, she had stopped taking medications that had been prescribed by Dr. Liautaud. Hunter stated she was having family problems, and she had considered overdosing on her medications but friends had convinced her to seek help. Hunter was "rather uncooperative" during the evaluation, and would not be open and honest with the doctor. She later stated she had had an argument with her father, her child care responsibilities were somewhat overwhelming, and she really did not want to hurt herself and wanted to leave the hospital. She became hostile and stated she would leave

AMA, but the doctor stated that due to Hunter's behavior, "she could be committed for treatment if necessary." (*See* R. 292-98)

The evaluating doctor's diagnostic impressions were numerous, including bipolar disorder (by history), adjustment disorder, borderline personality disorder, cannabis dependence, and polysubstance dependence in partial to full remission. He reached the following conclusions and opinions regarding Hunter's condition and treatment:

> [Hunter] is not very cooperative. I also think that some of her behaviors are drug seeking in nature. She repeatedly requested to be put back on Ritalin and stated that it was the only thing that made her feel "good". I suspect that her dependence and use of cannabis may be becoming problematic and there may be other issues that need to be dealt with. We will discuss this with her case worker.
>
> In the interim we are going to refer her to all of the available therapies, attempt to get a drug screen and start her back on the medications that were prescribed by Dr. Liautaud. I see no evidence at this time that she should have a prolonged hospitalization, but if she does leave she will have to leave AMA. I think that she does need a period of observation and she is unwilling to discuss the issues that prompted her hospitalization. Once we have made sure that there is no lethal thinking present she can be discharged AMA because she is so adamant about her lack of symptomology. There is no possibility that she could be committed at this point in time and I don't think that it actuality is indicated. I do believe that her hospitalization was prompted by secondary gain of some sort.

(R. 298)

Hunter saw Dr. Liautaud on June 1, 2005. She complained of sleep problems, and agreed to a trial of Ambien and Lamictal. (R. 304-06) Hunter saw the doctor for follow-up on June 22, 2005. She stated she had relapsed and used amphetamines once. Her social worker, Ms. Winkelman, stated Hunter had exhibited "a severe increase in mood swings, irritability, [and] bipolar symptoms" over the previous three months. Hunter had

11

discontinued the Lamictal due to allergy-like side effects, and she refused a trial of Seroquel. She still was taking Topamax and Xanax, as well as Celexa as needed, and Ambien at night as needed. The doctor suggested Hunter find new friends and responsibilities through her church. (R. 302-03)

Hunter's next follow-up with Dr. Liautaud was on July 27, 2005. She reported continuing depression and feelings of guilt. She had been abstaining from using alcohol or other drugs and was taking her medications as prescribed. She was sleeping better on the Ambien. Her medications remained unchanged. (R. 300-01)

On August 3, 2005, Dr. Liautaud completed a Mental Residual Functional Capacity Assessment of Hunter, with accompanying narrative comments. (R. 315-22) He opined that due to her psychiatric condition, severe bipolar symptoms, anxiety symptoms, and panic symptoms, Hunter would have marked limitations in almost every area of her work-related mental functional abilities, and she would be unable to work. He noted that her psychiatric condition had "resulted in her inability to maintain employment." (R. 315) He opined even a minimal increase in mental demands or change in the environment likely would cause Hunter to decompensate. The doctor opined that Hunter's disability was due primarily to "her emotional illness" (*id.*), and even if she discontinued using alcohol and all other drugs, she still would be disabled. He suggested Hunter would not be capable of managing benefits should they be awarded. (R. 315-22)

On August 22, 2005, Ms. Winkelman wrote a letter summarizing her observations of Hunter during the four-year period she had worked with Hunter. (R. 370-71) According to Ms. Winkelman, Hunter's "mental health issues, genetics, and the pain of her childhood were the driving factors in her substance abuse." (R. 370) Ms. Winkelman observed that Hunter requires assistance to manage her finances, care for her personal needs and the needs of her children, follow through with commitments, transport herself and her children as necessary, manage her anger, parent her children, and deal with social

situations. Although Ms. Winkelman had observed improvement in all areas over the years, she indicated Hunter would continue to require long-term "support, advocacy and encouragement to seek mature solutions to her problems through counseling and support services." (R. 371) In Ms. Winkelman's opinion, Hunter would be unable to handle even part-time employment. (*Id.*)

On June 1, 2006, Hunter underwent a work evaluation at Wesco Industries, "a rehabilitation facility located in Denison, Iowa . . . [that] offers work, residential, supported community living, supported employment, and evaluation services." (R. 372; *see* R. 372-76) The evaluator observed that although Hunter was cooperative and put forth good effort at each task, she performed at "well below average" on all tasks. Instructions had to be repeated to Hunter, and she could not complete multi-step instructions without reminders or repetition of instructions. She was distracted easily and had difficulty remaining on task. In addition, she exhibited discomfort and irritability when she was around even a very small group of people. The evaluator reached the following conclusions from Hunter's testing:

> I believe that it would be very difficult for Ms. Hunter to function in a competitive job market. It is my opinion she would need assistance in locating a job that would suit her capabilities and limitations. It is also my belief that Ms. Hunter would require additional supervision to perform most job duties. I believe that Ms. Hunter would have difficulties dealing with co-workers and supervisors. It would be very difficult for Ms. Hunter to maintain even an unskilled job due to her inability to remain on task and low quantity of work compared to competitive standards. Ms. Hunter's inability to interact with people appropriately and poor work skills would also impede her ability to secure and maintain employment.

(R. 376)

13

### 3.    *Vocational expert's testimony*

The ALJ indicated that based on Hunter's earnings records, none of her past work activity was at the substantial gainful activity level. (R. 412)  The ALJ asked the VE to consider an individual who was twenty-five years old at the amended alleged onset date, with a tenth grade education, and no past relevant work.  The individual would be limited to simple, routine, constant tasks, with no changes and no independent decision-making. She would require occasional supervision, meaning she would have to be reminded of tasks four times daily.   She could have only occasional interaction with the public and coworkers, and frequent contact or interaction with supervisors. (R. 412-13)

The VE noted that requiring a supervisor to remind the individual of tasks four times daily would not be "really excessive" because "there would be a supervisor around." (R. 413)  As a result, the VE indicated the individual could perform light, unskilled jobs including cleaner/housekeeper, "in the category of being janitor cleaner"; marker, "in the category of stock clerks and order fillers"; and laundry folder, "in the category of production workers." (*Id.*)

The ALJ next asked the VE to consider the same individual, but add the requirement that she be reminded of tasks twelve times daily, and she would be unable to sustain an eight-hour workday due to mental problems.  The VE stated either the need for such frequent supervision or the inability to complete a full workday would preclude all competitive employment. (R. 413-14)

### 4.    *The ALJ's decision*

The ALJ found Hunter had not engaged in substantial gainful activity at any time relevant to her application for benefits. (R. 20)  He found that Hunter has severe impairments consisting of "borderline intellectual functioning, bipolar disorder, attention deficit hyperactivity disorder, panic disorder without agoraphobia and a history of

14

substance abuse." (*Id.*)  He further found Hunter has non-severe conditions that include asthma, eczema, and nicotine abuse.  (R. 23)  The ALJ found that although Hunter has severe impairments, her impairments do not meet or medically equal an impairment listed in the regulations.  He found that when Hunter is not abusing substances, her "impairments do not impose more than moderate limitations in [her] mental functioning[.]"  (*Id.*)

The ALJ found Hunter has no past relevant work, and when her age, education, work experience, and residual functional capacity are considered, there are no jobs that exist in significant numbers in the national economy that Hunter can perform.  (R. 25)  However, the ALJ further found that if Hunter did not abuse substances, there would be jobs she could perform, including, for example, cleaner/housekeeper, marker, and laundry folder.  (R. 26-28)  The ALJ found Hunter's allegations concerning the degree of her limitations not to be credible.  The ALJ noted Hunter claims she stopped abusing substances in October 2003, but the record since that time contains several references to her continued use and abuse of substances.  (*See* R. 20-28)  He indicated the record reflects that when Hunter is not abusing substances, "she does fairly well," and has only moderate limitations in her ability to work and to care for herself, her children, and her home.  (R. 24)

Because he concluded Hunted would be able to work if she stopped using alcohol and other drugs, the ALJ held Hunter's "substance use disorder(s) is a contributing factor material to the determination of disability," and she therefore is not disabled within the meaning of the Social Security Act.  (R. 29)  In so finding, the ALJ gave only minimal weight to Dr. Liautaud's opinion regarding Hunter's residual functional capacity, which the ALJ found to be inconsistent with both the doctor's own treatment notes and the other evidence in the record as a whole.  (R. 24)

15

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Hillier v. Social Security Admin.*, ___ F.3d ___, 2007 WL 1412404 at *3 (8th Cir. May 15, 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003. First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such

16

abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).  *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.'  *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996).").

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.  If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience.  20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*.  The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC,

17

but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

18

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health &*

*Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823

Case 3:06-cv-03056-MWB    Document 13    Filed 06/05/07    Page 20 of 25

F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).


## IV. DISCUSSION

The ALJ concluded Hunter is disabled, but her substance use/abuse is a contributing factor material to her disability. This conclusion forms the crux of the parties' arguments in the present case.

Hunter bears the burden of proving her substance use is not a contributing factor material to the disability determination. *Brueggemann v. Barnhart*, 348 F.3d 689, 693

Case 3:06-cv-03056-MWB   Document 13   Filed 06/05/07   Page 21 of 25

(8th Cir. 2003) (citing *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002), in turn citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000)). In other words, Hunter must demonstrate that she still would be disabled if she were to stop all use of alcohol and other drugs. *Vester v. Barnhart*, 416 F.3d 886, 888 (8th Cir. 2005) (citing 20 C.F.R. § 416.935(b)(1); *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir. 2000)).

"However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding." *Brueggemann*, 348 F.3d at 693 (citing *Hildebrand v. Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002)). This responsibility remains even when the task is complicated by a claimant's continued use/abuse of substances, whether that use/abuse is intermittent or frequent. *See Brueggemann*, 348 F.3d at 695 (citing *Pettit*, 218 F.3d at 903).

In the present case, the only medical professional to offer an opinion regarding the effect of Hunter's substance use/abuse on her ability to work was Dr. Liautaud, one of Hunter's treating physicians, who indicated Hunter would be disabled even if she stopped using substances. (*See* R. 315, 319) In the consultant Dr. Wallace's report from his psychological testing of Hunter, he addressed only Hunter's borderline intellectual functioning, which was the result of his objective testing, and Hunter's other symptoms based on the history she provided to him. Dr. Wallace did not mention Hunter's substance abuse disorder or take it into consideration in forming his conclusions that Hunter's borderline intellectual capabilities likely would render her "less able to cope effectively with symptoms associated with her other psychiatric disorders." (R. 206)

Consultant David G. Beeman, Ph.D. also offered no opinion regarding the degree to which Hunter's impairments are affected by her substance abuse. From his paper review of the record, he concluded Hunter "retains the ability to complete simple, routine, and repetitive work functions when motivated to do so," without indicating whether this conclusion was based on periods when Hunter was using substances or not. If the former,

then the ALJ's decision that Hunter is, in fact, disabled when she is using substances is contrary to Dr. Beeman's opinion.

The ALJ failed to give controlled weight to Dr. Liautaud's opinion that Hunter would have marked limitations in most work-related areas even when she is not using/abusing substances, because the ALJ found the doctor's conclusion was inconsistent with the doctor's treatment notes. (*See* R. 24) However, Dr. Liautaud did more than simply fill out a check-sheet. He provided narrative reasoning to support each of his responses. He specifically indicated Hunter "is disabled more so for her emotional illness," and she would have continuing, disabling symptoms that would prevent her from working even if she discontinued using substances. (R. 315, #8) Dr. Liautaud's assessment of Hunter's capacity to work is consistent with the opinion of social worker Judy Winkelman, who has worked with Hunter on almost a daily basis for several years. The doctor's assessment also is consistent with Hunter's work evaluation at Wesco, in which the evaluator found that although Hunter was cooperative and put forth a good effort at all tasks, she was unable to remain on task without almost constant supervision, and she produced a low quantity of work when compared to competitive standards. (*See* R. 376)

It is not the function of the ALJ or the court to determine whether a claimant's substance abuse caused her impairments. "The focus of the inquiry is on the impairments remaining if the substance abuse ceased, and whether those impairments are disabling, *regardless of their cause*." *Pettit*, 218 F.3d at 903 (emphasis added); *see Brueggemann*, 348 F.3d at 694 ("The inquiry here concerns strictly symptoms, not causes. . . ."). Here, the ALJ found that when Hunter is not abusing substances, she is able to care for herself, her children, and her home with only minimal assistance from others, and she would be able to perform simple, unskilled work. The record does not contain substantial evidence to support that conclusion, despite the occasional comments that Hunter was "fairly stable" and exhibited "some improvement." *See Hutsell v. Massanari*, 259 F.3d 707, 712 (8th

23

Cir. 2001) (report that patient is "doing well" has "no necessary relation to a claimant's ability to work"). The record evidence indicates that, separate and apart from her substance abuse issues, Hunter is a person of borderline intelligence with a long-term history of bipolar disorder and other mental disorders. Although the record contains evidence that Hunter has some limited ability to function in the workplace, the record contains no evidence, let alone substantial evidence, that she could perform the requisite work-related activities "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (*en banc*).

The record does not contain substantial evidence to support the ALJ's determination that Hunter retains the ability to work if she were not using/abusing any substances. The only medical professional to offer an opinion on the issue was Dr. Liautaud, one of Hunter's treating physicians, and he concluded otherwise. Additional substantial evidence supports the doctor's conclusion. The undersigned finds the ALJ erred in determining that Hunter's substance use disorder is a contributing factor material to her disability. As a result, the undersigned finds the decision should be reversed, and this case should be remanded for calculation and award of benefits.

24

## V. CONCLUSION

Accordingly, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[3] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of benefits.

**IT IS SO ORDERED.**

**DATED** this 5th day of June, 2007.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[3]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

25